MILLER v MILLER

Docket No. 242470. Submitted January 15, 2004, at Detroit. Decided November 30, 2004, at 9:00 a.m. Leave to appeal sought.

Debra L. Miller sought a divorce from John T. Miller in the Wayne Circuit Court. Following unsuccessful efforts to settle the case, the court, Mary Beth Kelly, J., entered a stipulated order for binding arbitration under the domestic relations arbitration act (DRAA), MCL 600.5070 *et seq*. After the arbitrator presented a final, binding arbitration award, the plaintiff moved to set the award aside and appoint a new arbitrator, claiming that there was no agreement by the parties for binding arbitration, and that the arbitrator failed to meet with the parties and conduct a hearing, as required by the DRAA. The court entered a divorce judgment that incorporated the arbitration award and subsequently denied the plaintiff's motion to set aside the arbitration award and appoint a new arbitrator. The plaintiff appealed.

The Court of Appeals *held*:

The trial court erred in refusing to set aside the arbitration award. The DRAA requires a full and fair hearing before a neutral arbitrator. A party who gives up the rights afforded by litigation in exchange for binding arbitration cannot be deprived of the right to a full and fair hearing absent a knowing and voluntary waiver of that right. Ex parte meetings with the parties and efforts at settlement, mediation, or "shuttle diplomacy," such as occurred in this case, do not satisfy the DRAA's requirement of a full and fair hearing.

Reversed and remanded; arbitration award vacated.

KELLY, J., dissenting, stated that the arbitrator did not unfairly deny the plaintiff's requests, refuse to hear her evidence, or conduct the hearing unfairly. There was no indication that the arbitration procedures exceeded the arbitrator's authority or lacked impartiality. The DRAA does not require that arbitration, including a hearing, be conducted in any specific manner, but only requires the arbitrator to conduct the hearing in accordance with the parties' agreement. The procedure followed afforded the parties basic protective rights, including a full and fair hearing. Appellate review of arbitration is limited. The majority holding

departs from the plain language of the DRAA and existing prece-
dent, and creates public policy that threatens to disrupt the
arbitration process. Parties may now appeal arbitration awards on
the nebulous grounds that the procedure leading to the award was
not a "hearing" with no record for this Court to review. The
arbitration award should be affirmed.

Arbitration — Domestic Relations — Hearing.

Arbitration under the domestic relations arbitration act requires
that a full and fair hearing be conducted before a neutral arbitra-
tor; ex parte meetings with the parties and efforts at settlement,
mediation, and "shuttle diplomacy" do not satisfy the requirement
of a full and fair hearing (MCL 600.5070 et seq.).

*Donald M. Fulkerson* for the plaintiff.

*Dennis T. Donahue* and *Gentry Law Offices, P.C.* (by
*Kevin S. Gentry*), for the defendant.

Before: Smolenski, P.J., and Saad and Kelly, JJ.

Saad, J.

## I. NATURE OF THE CASE

After unsuccessful efforts to settle this divorce case,
the trial court entered a stipulated order for binding
arbitration under Michigan's Domestic Relations Arbi-
tration Act (DRAA).[1] Pursuant to the express terms of
the trial court's order, the parties understood that this
litigation would be arbitrated pursuant to the DRAA.
Yet, rather than conducting a hearing, as that term is
used by our Legislature,[2] the arbitrator instead at-

---

[1] MCL 600.5070 et seq.

[2] "Black's Law Dictionary (Rev. 4th ed. 1968), defines a hearing as a
'[p]roceeding of relative formality * * * with definite issues of fact or of
law to be tried * * * much the same as a trial. . . .' In its popular sense, the
term applies to any formal proceeding before a judge or other magistrate
exercising a judicial function." *In re Marriage of Fine*, 116 Ill App 3d 875,
877; 452 NE2d 691 (1983).

tempted to settle the matter by mediation and ultimately issued what the arbitrator characterized as an "arbitral award" despite plaintiff's unsatisfied request for an arbitral hearing. The trial court affirmed the "arbitral award" over plaintiff's objection that she was never afforded the hearing guaranteed under the DRAA.

Accordingly, the sole issue on appeal is whether a domestic relations litigant is bound by an "arbitral award" if the arbitrator does not conduct a hearing, but instead meets with the parties ex parte in an effort to settle the case. Put another way, the question is whether the trial court should have vacated the "arbitral award" because the arbitrator failed to follow the unambiguous provisions of the DRAA.

Under the clear, mandatory language of the DRAA, litigants who give up the numerous rights afforded by general litigation in circuit court and instead choose

"An arbitration implies a difference, a dispute, and involves ordinarily a hearing and all thereby implied. The right to notice of hearings, to produce evidence and cross-examine that produced is implied when the matter to be decided is one of dispute and difference." *Omaha v Omaha Water Co*, 218 US 180, 194; 30 S Ct 615; 54 L Ed 991 (1910).

*The Random House Dictionary of the English Language: Second Edition Unabridged* defines "hearing" as "an instance or a session in which testimony and arguments are presented, esp. before an official, as a judge in a lawsuit."

In the context of parole violation hearings, this Court stated that "[t]he present statute does not spell out the right of the parolee to produce witnesses and proofs, but it does provide for a hearing. It is the opinion of this Court that a hearing necessarily comprehends the right of the accused to produce witnesses and proofs and to meet the witnesses who are produced against him. *We are of the opinion that any proceeding which does not provide for the production of witnesses and the introduction of evidence would not be a hearing at all.*" *Feazel v Dep't of Corrections*, 31 Mich App 425, 431; 188 NW2d 59 (1971) (emphasis added).

binding arbitration to adjudicate their domestic relations claims are afforded basic, protective rights, the most important of which is a full and fair hearing. Here, this essential statutory right was neither waived nor provided and, therefore, we reverse the trial court's erroneous refusal to set aside the "arbitral award."

### II. FACTS AND PROCEEDINGS

Because our opinion deals only with the denial of plaintiff's statutory right to a hearing under the DRAA, we will forgo the usual recitation of facts regarding this divorce. Rather, the relevant facts here deal exclusively with the nature of the proceedings and the arbitration.

Plaintiff filed for divorce in January 2001, and the court attempted an in camera settlement conference with the parties on October 10, 2001. The court held a further settlement conference on October 26, 2001, and scheduled another settlement conference for November 30, 2001, informing the parties that if they could not reach a settlement by that date, the matter would be referred to arbitration. On December 4, 2001, the trial court entered a stipulated order for binding arbitration of all issues of the divorce.[3]

The "arbitration"[4] took place on February 20, 2002. The arbitrator separated the parties into two rooms and attempted to resolve certain contentious issues between the parties. According to plaintiff's testimony, the arbitrator explained that if the "arbitration" was not fin-

---

[3] The trial court's order stated, in relevant part, "[b]y approval of this Order for entry by the parties and their respective attorneys, the Court, pursuant to the provisions of [the DRAA], the Court [sic] refers all issues in this civil action to binding arbitration."

[4] We use the term "arbitration" in quotes here because, as we make clear in this opinion, we do not regard the arbitrator's efforts to settle this case to be the equivalent of arbitration. We find it difficult to find the right phraseology to describe what the arbitrator did here. Arbitration

ished that day, he would use the initial session as a fact-finding or mediation session and, if this proved unsuccessful, he would schedule future dates for an arbitral hearing. According to plaintiff, the arbitrator said that if the initial procedure proved ineffective, he would proceed with formal arbitration with the usual introduction of testimony and documents through witnesses. At some point in the proceedings, the arbitrator advised plaintiff and her attorney that defendant had to leave to return to Colorado and that the arbitrator would attempt to resolve the matter without any further hearing dates. In response, plaintiff says that she requested additional arbitration sessions so that she could present her case and witnesses and cross-examine defendant. Despite this request, the arbitrator did not schedule an arbitral hearing. Instead, on April 1, 2002, the arbitrator issued a proposed award without scheduling any further sessions and without providing the parties the opportunity for direct or cross-examination or the introduction of exhibits. Upon receiving the proposed award, plaintiff's counsel again requested additional hearing dates to present plaintiff's case. Among many other substantive complaints that plaintiff had regarding the proposed award, plaintiff vigorously complained that the arbitrator totally failed to comply with the DRAA by his failure to hold a hearing. On April 10, 2002, the arbitrator presented a final,

was ordered, but no arbitration took place in the traditional sense of the word because no hearing took place, no witnesses were sworn in, and no testimony was taken. Plaintiff sought additional "sessions" because she wanted the chance to present her case in the manner commonly defined as an arbitration. The arbitrator's efforts at settlement mimicked the procedure known as mediation, but he nonetheless characterized the "proceeding" in his "award" as a "hearing." It is little wonder that plaintiff, who simply asked to present her case, found it difficult to define, but nonetheless understandably objected to, what transpired on the day she expected to present her case to an arbitrator.

binding "arbitral award" that the arbitrator said reflected many of the substantive objections outlined by plaintiff, except the objection that plaintiff was never afforded her statutory right to a hearing.

On April 19, 2002, plaintiff filed a motion to set aside the "arbitral award" and to appoint a new arbitrator. Plaintiff asserted, correctly, that the arbitrator failed to meet with the parties in the manner and for the purpose specified by the DRAA,[5] and failed to conduct a hearing as required by the act.[6] Plaintiff also maintained, again correctly, that the matter proceeded to arbitration without the statutorily mandated stipulation agreement for binding arbitration. MCL 600.5071. On May 24, 2002, the trial court heard arguments and rejected plaintiff's objections and entered a judgment of divorce that incorporated the "arbitral award." On June 21, 2002, the trial court entered an order denying plaintiff's motion to set aside the "arbitral award." This appeal followed and we reverse the trial court's erroneous denial of plaintiff's motion to set aside the award for the reasons stated below.

### III. ANALYSIS

For many years, Michigan's statutes and court rules provided rules for arbitration in general,[7] but not specifically for domestic relations matters. And, although this Court approved the use of arbitration in domestic relations matters, our case law did not provide guide-

---

[5] MCL 600.5076.

[6] MCL 600.5074(1) provides: "An arbitrator appointed under this chapter *shall hear* and make an award on each issue submitted for arbitration . . . ." (Emphasis added.)

[7] See MCL 600.5001 *et seq.* (arbitration statute); MCR 3.602 (court rule governing arbitration).

lines for these arbitrations. See *Dick v Dick*, 210 Mich App 576; 534 NW2d 185 (1995).

The Legislature noted the absence of procedures and safeguards for fair arbitral hearings in domestic relations matters and, to encourage domestic relations litigants to give up their litigation rights and choose binding arbitration, responded by enacting the DRAA.[8]

*REQUIREMENTS FOR BINDING ARBITRATION UNDER THE DRAA*

The DRAA provides numerous due process or procedural protections to a domestic relations party who agrees to binding arbitration. The DRAA provides that the parties who agree to binding arbitration should do so "by a signed agreement that specifically provides for an award" regarding delineated issues. MCL 600.5071. Further, the DRAA specifically prohibits a court from ordering a domestic relations party to participate in arbitration "unless each party to the domestic relations matter acknowledges, in writing or on the record, that

---

[8] A legislative analysis of the DRAA as enrolled states:

[T]he RJA does not specifically address arbitration in domestic relations matters, and so provides no guidelines or standards for such arbitration. Michigan court rule [3.216(A)(3)] allows a court to order arbitration, upon stipulation of the parties, but also doesn't provide standards or guidelines for such arbitration. . . .

. . . Because of crowded court dockets and the fact that criminal cases must take precedence over other matters, the parties (and their families) in a domestic relations dispute may find themselves waiting a long time before they have a hearing to resolve the dispute and as a result often will resort to alternative dispute resolution methods.

The bills would address all of these problems. Standards and guidelines would provide uniformity to the process and safeguards that are essential to fair hearings. [House Legislative Analysis, HB 4552 and 4615, January 5, 2001, p 5.]

he or she has been informed in plain language" of the salient features of arbitration.[9]

Importantly, MCL 600.5072(1)(e) provides that "[t]he arbitrator's powers and duties are delineated in a *written arbitration agreement* that all parties must sign

---

[9] MCL 600.5072(1) provides:

The court shall not order a party to participate in arbitration unless each party to the domestic relations matter acknowledges, in writing or on the record, that he or she has been informed in plain language of all of the following:

(a) Arbitration is voluntary.

(b) Arbitration is binding and the right of appeal is limited.

(c) Arbitration is not recommended for cases involving domestic violence.

(d) Arbitration may not be appropriate in all cases.

(e) The arbitrator's powers and duties are delineated in a written arbitration agreement that all parties must sign before arbitration commences.

(f) During arbitration, the arbitrator has the power to decide each issue assigned to arbitration under the arbitration agreement. The court will, however, enforce the arbitrator's decisions on those issues.

(g) The party may consult with an attorney before entering into the arbitration process or may choose to be represented by an attorney throughout the entire process.

(h) If the party cannot afford an attorney, the party may wish to seek free legal services, which may or may not be available.

(i) A party to arbitration will be responsible, either solely or jointly with other parties, to pay for the cost of the arbitration, including fees for the arbitrator's services. In comparison, a party does not pay for the court to hear and decide an issue, except for payment of filing and other court fees prescribed by statute or court rule for which the party is responsible regardless of the use of arbitration.

before arbitration commences." (Emphasis added.)
MCL 600.5073 provides for the qualifications and ap-
pointment of an arbitrator.

Most importantly to our holding, in language that
specifies that a domestic relations litigant who gives up
her right to litigate her matter in court shall have a full
and fair arbitral hearing, the DRAA unambiguously
provides that

> [a]n arbitrator appointed under this chapter *shall hear* and
> make an award on each issue submitted for arbitration
> under the arbitration agreement subject to the provisions
> of the agreement. [MCL 600.5074(1) (emphasis added).]

With respect to defendant's contention and the trial
court's erroneous holding that ex parte meetings with
the parties satisfy this statutory mandate for a "hear-
ing," we hold that the DRAA is clear and unambiguous
in requiring a hearing. *Id.* A party who gives up her
right to litigate her case in court, including substantial
discovery and appellate rights, in exchange for binding
arbitration may not be deprived of her right to present
her case before a neutral arbitrator. To underscore this
clear mandate, the DRAA requires the arbitrator to
meet with the parties to discuss the scope of the issues,
the date, time and place of the *hearing*, including
witnesses and experts who may testify, and a schedule
for exchange of expert reports or summary of expert
testimony.[10] By this provision, the Legislature clearly

---

[10] MCL 600.5076(1) provides:

> As soon as practicable after the appointment of the arbitrator,
> the parties and attorneys shall meet with the arbitrator to
> consider all of the following:
>
> (a) Scope of the issues submitted.
>
> (b) Date, time, and *place of the hearing*.

expressed its intent that the arbitrator and the parties would meet and prepare thoroughly for a full and fair hearing. Indeed, the meeting required by MCL 600.5076 serves as the functional equivalent of a "pretrial conference" so the parties can plan to present their case at the arbitral hearing. For us to hold that the DRAA requires this preparatory meeting, but not the hearing itself, would do an injustice to the legislative scheme and the parties. Further, in reviewing the grounds for vacation of an arbitral award under the DRAA, we note, importantly, that the statute requires a court to vacate an award when

> [t]he arbitrator refused to postpone the *hearing* on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise *conducted the hearing* to prejudice substantially a party's right.[11]

In the face of this strong legislative direction to our judiciary to ensure fair hearings for domestic relations parties who choose arbitration, a trial court simply must overturn any award in which the arbitrator has denied either party the statutory right to a hearing. It would be contrary to the letter and spirit of the DRAA to mandate that courts vacate arbitral awards when

---

(c) Witnesses, including experts, *who may testify.*

(d) Schedule for exchange of expert reports or summary of expert testimony.

(e) Subject to subsection (2), exhibits, documents, or other information each party considers applicable and material to the case and a schedule for production or exchange of the information. If a party knew or reasonably should have known about the existence of information the party is required to produce, that party waives objection to producing that information if the party does not object before the *hearing.* [Emphasis added.]

11 MCL 600.5081(2)(d) (emphasis added).

arbitrators unfairly denied parties' requests for adjournment, unfairly refused to hear evidence, or unfairly conducted the hearing, but to nonetheless affirm awards when parties were denied their right to any hearing whatsoever. Indeed, to do so would be contrary to the plain language of the statute and contrary to the interests of parties in domestic relations litigation.

To keep faith with the Legislature's intent, courts and arbitrators must proceed in full compliance with the DRAA.[12] Efforts at settlement, mediation, or "shuttle diplomacy" simply will not satisfy the plain language of the statute.[13] Under the DRAA, nothing

---

[12] Here, the court did not require the statutory stipulation agreement for binding arbitration. Instead, the court entered an order that simply quoted from the statute and ruled that this was sufficient. The DRAA requires that the parties sign an agreement as a protection to the parties and a trial court must adhere to this provision. Because our holding addresses the need for a hearing, we need not address whether the lack of this stipulation requires reversal or vacation of the "arbitral award," and we decline to address that question here. However, we note that this Court has held, in another context, that a stipulated order that does not conform to the DRAA's requirements is void. *Harvey v Harvey*, 257 Mich App 278, 291; 668 NW2d 187 (2003), aff'd 470 Mich 186; 680 NW2d 835 (2004).

[13] To hold otherwise here would be tantamount to conceding that a "hearing" can be defined by any trial court or arbitrator as something other than a hearing. A word that has clear meaning must be given its clear meaning instead of whatever meaning one chooses to give it:

"I don't know what you mean by 'glory,' " Alice said.

Humpty Dumpty smiled contemptuously. "Of course you don't —till I tell you. I meant 'there's a nice knock-down argument for you!' "

"But 'glory' doesn't mean 'a nice knock-down argument,' " Alice objected.

"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."

short of a full and fair hearing will suffice.[14] To satisfy this express language[15] and the purpose of the DRAA, absent a knowing and voluntary waiver of the right to a hearing, courts and arbitrators must ensure full compliance with the protections of the DRAA.[16]

---

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all." [Carroll, *Through the Looking Glass and What Alice Found There,* in *The Annotated Alice* (New York: Bromhill House, 1960), pp 268-269.]

[14] Our courts have historically required a full and fair hearing as a precondition to binding arbitration. See *Renny v Port Huron Hosp,* 427 Mich 415, 437; 398 NW2d 327 (1986) (arbitration of employment contract claims), and *Rembert v Ryan's Family Steak Houses, Inc,* 235 Mich App 118, 161; 596 NW2d 208 (1999) (arbitration of statutory employment discrimination claims).

[15] "An arbitrator appointed under this chapter *shall hear* and make an award on each issue submitted for arbitration under the arbitration agreement subject to the provisions of the agreement." MCL 600.5074(1) (emphasis added).

[16] If a domestic relations party is to be held to have waived any of her enumerated statutory rights and protections afforded to her by the Legislature, the waiver must be clear, knowing and voluntary. This Court has noted in other contexts, with respect to domestic relations, that parties may waive statutory rights, but any waiver should be clear and unambiguous. *Staple v Staple,* 241 Mich App 562, 568; 616 NW2d 219 (2000). Here, there is no evidence of plaintiff's knowing and voluntary waiver of her rights to a full and fair hearing. The dissent cannot seriously contend that plaintiff clearly and voluntarily waived her right to a hearing. Indeed, plaintiff and her counsel repeatedly asked for a hearing and have contended at every step of the proceeding that they desired a hearing in the sense that this term is commonly understood— the right to present evidence and to challenge the evidence presented by the other side.

At a hearing on June 28, 2002, plaintiff's counsel stated, "As to Mr. Tucker [the arbitrator] in our response, one of the things we continually urged Mr. Tucker to do was to hold arbitration hearings where we could put people under oath and present evidence. He was adamant, would not

## IV. RESPONSE TO THE DISSENT

The fundamental difference between our interpretation of the DRAA and that of the dissent is the dissent's willingness, but our refusal, to accept de facto mediation as satisfying the DRAA's requirement of a fair hearing. Here, the arbitrator in essence conducted what is commonly understood as domestic relations mediation under MCR 3.216 by placing the parties in separate rooms and attempting to settle the case through this "shuttle diplomacy." Of course, in mediation, the parties are not bound by this process and thus our Supreme Court does not require a hearing under MCR 3.216. That is, if the mediator proposes a settlement, the parties may reject the mediator's proposed settlement agreement. This graphically underscores the difference between mediation, which occurred here, and binding arbitration, in which the parties' lives may be altered substantially and forever because of the binding nature of an arbitral award and the limited right of appeal from arbitral awards. Furthermore, recognizing that important rights are determined with finality in arbitrations, this Court has held that a basic prerequisite to a binding arbitral award is a full and fair hearing.[17]

The dissent misapprehends the Legislature's intent and ignores the plain language of the statute and, further, misapprehends and misstates our very precise

---

allow my client to testify, would not allow me to cross examine the defendant, would not allow me to call witnesses." At an earlier hearing, plaintiff's counsel told the trial court that "Mr. Tucker spent very little time with us that day. He told my client and I we would be coming back to future sessions. In the afternoon he said Mr. Miller had to go back to Colorado that day, so we wouldn't be able to continue the next day. When I left that day, I was to contact him in two or three days in an attempt to schedule continued hearings. In summary, he didn't comply with either the order of the Court as arbitration or the statute."

[17] See *Renny, supra; Rembert, supra.*

holding. We need not, and thus do not, as the Legislature did not, define with particularity the precise dimensions of a full and fair hearing. The Legislature may, of course, use terms of art such as "hearing," "witness," and "testify," knowing that decades or indeed centuries of legal practice give meaning to these words, which will be honored by the judiciary.[18] Indeed, the Legislature need not define every word used in a statute that addresses areas of professional practice or a learned profession. We do not, nor should we, seek here to define with precision and finality what each term, such as "hearing," means. Yet, neither are we limited from making a prudential judgment that what occurred here fails, woefully, to satisfy even the most minimal concept of a hearing. Indeed, when faced with these facts, it is incumbent upon us to rule that something that fails to even remotely resemble a hearing is clearly less than what the Legislature contemplated when it called for arbitral hearings as a predicate to binding arbitral awards. It is keeping faith with the legislative intent, not "paternalistic,"[19] to hold as we do

---

[18] As a guideline to statutory interpretation, the United States Supreme Court has stated:

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." [*Immigration & Naturalization Service v St Cyr*, 533 US 289, 312 n 35; 121 S Ct 2271; 150 L Ed 2d 347 (2001), quoting *Morissette v United States*, 342 US 246, 263; 72 S Ct 240; 96 L Ed 288 (1952).]

[19] *Post* at 522.

that the Legislature would not tolerate a domestic relations litigant being bound by an arbitral award without the basic right of having presented her case and having contested her opponent's case in a hearing. Secret meetings behind closed doors, followed by binding "arbitral awards," are patently unacceptable. Were we to hold, as defendant and the dissent urge, that what transpired here satisfies the legislative mandate for a full and fair hearing, we would repudiate the numerous provisions of the DRAA that the Legislature promulgated as "safeguards that are essentials to fair hearings."[20] And, were we to adopt the view of the dissent, litigants would be understandably reluctant to place their fate in the hands of a process that afforded little or no right to be heard in any meaningful sense. As we read the statute, what transpired here falls short of what the Legislature intended and what the plain language of the statute requires. It is not a process that we should or will endorse.

---

[20] As we observed in n 8, a legislative analysis of the DRAA as enrolled states:

[T]he RJA does not specifically address arbitration in domestic relations matters, and so provides no guidelines or standards for such arbitration. Michigan court rule [3.216(A)(3)] allows a court to order arbitration, upon stipulation of the parties, but also doesn't provide standards or guidelines for such arbitration. . . .

. . . Because of crowded court dockets and the fact that criminal cases must take precedence over other matters, the parties (and their families) in a domestic relations dispute may find themselves waiting a long time before they have a hearing to resolve the dispute and as a result often will resort to alternative dispute resolution methods.

The bills would address all of these problems. Standards and guidelines would provide uniformity to the process and safeguards that are essential to fair hearings. [House Legislative Analysis, HB 4552 and 4615, January 5, 2001, p 5.]

V. CONCLUSION

The DRAA's purpose of encouraging litigants to opt for binding arbitration and forgo litigation to reduce dockets and provide expeditious, inexpensive, and fair alternatives to protracted litigation in domestic relations matters would be severely undermined, as would confidence in the statutory scheme, were we to permit an arbitrator, as here, to arbitrarily substitute ex parte meetings with the parties for the statutory guarantee of a full and fair hearing.

Accordingly, we hold that the DRAA requires, among other important protections afforded to a domestic relations party, a full and fair hearing before a neutral arbitrator. Therefore, we reverse the trial court's judgment of divorce that incorporated the "arbitral award," vacate the "arbitral award," and remand to the trial court for proceedings consistent with our opinion. We do not retain jurisdiction.

SMOLENSKI, P.J., concurred.

KELLY, J. *(dissenting)*. I respectfully dissent from the majority's decision to reverse the trial court's order denying plaintiff's motion to vacate the arbitration award. I believe that the public policy that the majority unwisely attempts to create threatens to disrupt the arbitration process by causing instability in this area of the law and threatening the finality of arbitration awards. The decision departs not only from the plain language of the domestic relations arbitration act (DRAA), MCL 600.5070 *et seq.*, but also from existing precedent. The protection that the Legislature and the courts have afforded is the protection of the parties' agreement to arbitrate without unwarranted intrusion by the courts. The very reason appellate review of

arbitration is limited is to afford this protection. I would affirm.

## I. STANDARD OF REVIEW

"We review de novo a trial court's decision to enforce, vacate, or modify a statutory arbitration award." *Tokar v Albery*, 258 Mich App 350, 352; 671 NW2d 139 (2003). Our review of a binding arbitration award is "strictly limited by statue and court rule." *Krist v Krist*, 246 Mich App 59, 66; 631 NW2d 53 (2001). Because the arbitration order was entered after the effective date of 2000 PA 419 and 420, this case is governed by the specific statutory scheme set forth in the DRAA. *Harvey v Harvey*, 257 Mich App 278, 283; 668 NW2d 187 (2003), aff'd 470 Mich 186; 680 NW2d 835 (2004). The primary goal of statutory interpretation is to give effect to the intent of the Legislature by examining the plain language of the statute. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999).

## II. THE PLAIN LANGUAGE OF THE DRAA

I disagree with the majority's conclusion that the arbitrator failed to comply with the requirements of the DRAA. The majority reads into the DRAA a requirement that does not exist and precludes an arbitration procedure the DRAA does not preclude.

The majority correctly points out that the DRAA sets forth several specific requirements for arbitration. For example, the DRAA requires a signed agreement by the parties, MCL 600.5071, that delineates the arbitrator's powers and duties, MCL 600.5072. The DRAA also requires that the arbitrator "hear and make an award on each issue submitted for arbitration under the arbitration agreement subject to the provisions of the

agreement." MCL 600.5074(1). But the DRAA does not define "hearing," nor does it set forth any specific requirements for a hearing. Notably, the majority states that "hearing" is a word "that has a clear meaning [and] must be given its clear meaning," but the majority opinion does not indicate what a hearing *is*, only what it *is not*. *Ante* at 507. In a footnote, the majority refers to the dictionary definitions of "hearing," *ante* at 498-499, and concludes that what took place in this case did not constitute what is "commonly understood" as a hearing. *Ante* at 508. This provides little guidance for future judicial review and impermissibly imposes requirements beyond those imposed by the DRAA.

Pursuant to the majority opinion, parties may now appeal arbitration awards on the nebulous grounds that the procedure leading to the arbitration award was not a "hearing." But when these arbitration awards are appealed, there will likely be no record for this Court to review. Except in limited circumstances not applicable here, the DRAA *prohibits* making a record of arbitration hearings:

> Except as provided by this section, court rule, or the arbitration agreement, *a record shall not be made of an arbitration hearing under this chapter*. If a record is not required, an arbitrator may make a record to be used only by the arbitrator to aid in reaching the decision. The parties may provide in the arbitration agreement that a record be made of those portions of a hearing related to 1 or more issues subject to arbitration. [MCL 600.5077(1) (emphasis added).]

In the best-case scenario, the parties will generally agree about how the arbitration took place. In the worst-case scenario, the parties will disagree. How then will a court proceed to review the arbitration proceedings to determine if they constituted a "hearing" in accord with the majority's opinion, in which "hearing" is left undefined? Clearly if the Legislature had contem-

plated judicial review to determine whether arbitration hearings comported with some formulaic procedure, it would have *required* rather than *prohibited* recording arbitration hearings.

In addition to leaving "hearing" undefined and prohibiting making a record of arbitration hearings, the Legislature has strictly limited judicial review of arbitration awards. MCL 600.5081(2) provides:

> If a party applies under this section, the court shall vacate an award under any of the following circumstances:
>
> (a) The award was procured by corruption, fraud, or other undue means.
>
> (b) There was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights.
>
> (c) The arbitrator exceeded his or her powers.
>
> (d) The arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights.

Accordingly, the DRAA permits vacation or modification only if the arbitrator conducts a hearing in a prejudicial, corrupt, or fraudulent manner or if the arbitrator exceeds his or her powers, i.e., those powers that derive from the parties' agreement to arbitrate.

The DRAA specifies that the arbitrator's power is directly conferred by the parties' agreement:

> The court shall not order a party to participate in arbitration unless each party to the domestic relations matter acknowledges, in writing or on the record, that he or she has been informed in plain language of all of the following:

\* \* \*

(e) The arbitrator's powers and duties are delineated in a written arbitration agreement that all parties must sign before arbitration commences.

(f) During arbitration, the arbitrator has the power to decide each issue assigned to the arbitration under the arbitration agreement. The court will, however, enforce the arbitrator's decisions on those issues. [MCL 600.5072(1).]

Our courts have also recognized that "[a]rbitrators derive their authority to act from the parties' arbitration agreement." *Krist, supra* at 62, citing *Gordon Sel-Way, Inc v Spence Bros, Inc,* 438 Mich 488, 495; 475 NW2d 704 (1991). Arbitration is generally recognized as a matter of contract. *Rowry v Univ of Michigan,* 441 Mich 1, 10; 490 NW2d 305 (1992). Arbitration agreements are generally interpreted in the same manner as ordinary contracts; they must be enforced according to their terms to effectuate the intentions of the parties. *Amtower v William C Roney & Co,* 232 Mich App 226, 233-234; 590 NW2d 580 (1998).

Nothing in the plain language of the DRAA preludes parties from agreeing to a particular format for the arbitration procedure. The majority opinion, which precludes a divorcing couple from agreeing on an arbitration procedure, erroneously limits the parties' ability to contract. This directly contravenes the plain language of the DRAA, which affords the parties a degree of self-determination, lessens governmental intrusion into their private lives, avoids adversarial posturing, and reduces personal antagonisms. Not only does the DRAA encourage the parties to enter a contract to arbitrate, it also facilitates further agreement between the parties with respect to the procedural form of the arbitration hearing. This allows the parties to take responsibility for creating the method of resolving their dispute—a method that is uniquely suited to their relationship and resources. The DRAA sets forth the

requirements of this step in the arbitration process in MCL 600.5076(1), which provides:

> As soon as practicable after the appointment of the arbitrator, the parties and attorneys shall meet with the arbitrator to consider all of the following:
>
> (a) Scope of the issues submitted.
>
> (b) Date, time, and place of the hearing.
>
> (c) Witnesses, including experts, who may testify.
>
> (d) Schedule for exchange of expert reports or summary of expert testimony.
>
> (e) Subject to subsection (2), exhibits, documents, or other information each party considers applicable and material to the case and a schedule for production or exchange of the information. If a party knew or reasonably should have known about the existence of information the party is required to produce, that party waives objection to producing that information if the party does not object before the hearing.
>
> (f) Disclosure required under section 5075.[1]

Thus, reading the statute as a whole, it is clear that the safeguards the Legislature imposed through the DRAA do not require the arbitrator to conduct arbitration in any specific manner (because no specifics are set forth), but do require the arbitrator to conduct the hearing *in accordance with the parties' agreement*. The majority's professed aversion for the procedure on which the parties agreed does not provide a basis for vacating the award. "A court must not judicially legislate by adding into a statute provisions that the Legislature did not include." *In re Wayne Co Prosecutor,* 232 Mich App 482, 486; 591 NW2d 359 (1998). Further, although the majority refers to the process as media-

---

[1] MCL 600.5075 requires the arbitrator to disclose any circumstance that may affect his or her impartiality.

tion, the process was still binding; binding mediation is equivalent to arbitration and subject to the same judicial limitations on review. *Frain v Frain*, 213 Mich App 509, 511-513; 540 NW2d 741 (1995).

### III. PRECEDENT AND POLICY

The majority opinion also contravenes existing precedent and the underlying public policy regarding arbitration. Historically, Michigan courts have declined to establish requirements for arbitration proceedings. Michigan public policy favors arbitration to resolve disputes. *Rembert v Ryan's Family Steak Houses, Inc*, 235 Mich App 118, 128; 596 NW2d 208 (1999). As such, the scope of judicial review of arbitration is very narrow and procedural matters should be left to the arbitrator. *Huntington Woods v Ajax Paving Industries, Inc*, 177 Mich App 351, 356; 441 NW2d 99 (1989). The Michigan Supreme Court has acknowledged that judicial review of arbitration is restricted because courts are generally reluctant to speculate on what caused the arbitrator to rule as it did. "It is only the kind of legal error that is evident without scrutiny of intermediate mental indicia which remains reviewable . . . ." *DAIIE v Gavin*, 416 Mich 407, 429; 331 NW2d 418 (1982). The Court recognized that, with regard to arbitration, "there are no formal requirements of procedure and practice beyond those assuring impartiality, and no findings of fact or conclusions of law are required." *Id.* at 428. It also recognized that arbitration procedures are "informal and sometimes unorthodox . . . ." *Id.* at 429. In a departure from this precedent, the majority has put restrictions on the arbitration process that neither the Legislature nor our courts saw fit to impose.

IV. ANALYSIS

A closer look at the facts of this case reveals that the arbitrator did not, as the majority avers, unfairly deny plaintiff's requests, refuse to hear plaintiff's evidence, or unfairly conduct the hearing. Although there is no record of the arbitration proceedings, the majority opinion adopts without question and assumes as true plaintiff's assertions about what took place and what was said at arbitration. Because there is no record of the arbitration procedure, it is impossible for this Court to determine the veracity of plaintiff's assertions. But, on a basic level, the parties do not dispute that the arbitrator first met briefly with the parties and their attorneys to discuss the arbitration procedure. At that time, the parties *agreed* that, because of their acrimonious relationship, the arbitrator should meet with the parties and their respective attorneys separately. Neither party objected to this procedure; rather, each party voluntarily entered a separate room. Then each party, in the presence of his or her attorney, voluntarily spoke with the arbitrator.

Nonetheless, sometime after the hearing concluded, plaintiff's attorney contacted the arbitrator and requested additional arbitration sessions for plaintiff to further present her case and challenge defendant's assertions. Plaintiff also sent the arbitrator two amended arbitration statements and additional documentation pertaining to defendant's income.

The arbitrator issued a proposed award without scheduling further sessions. In his findings of fact, he noted that plaintiff had requested further sessions. But he concluded that plaintiff raised nothing new that would justify further delay. The arbitrator summarized the evidence regarding the breakdown of the marriage and concluded that both parties were at fault.

After receiving the proposed award, plaintiff again requested continued arbitration. The arbitrator gave plaintiff three days to submit an outline of the issues she wanted to pursue. Plaintiff provided the arbitrator with a lengthy response to the award. She asked for the opportunity to present further evidence of defendant's inappropriate use of massage parlors and escort services, and to cross-examine defendant in this regard, to establish that defendant caused the breakdown of the marriage. Plaintiff also complained about nearly every aspect of the award itself.

The arbitrator rendered a final, binding arbitration award in which he stated that he had considered plaintiff's concerns, but found that plaintiff failed to raise any new facts or issues. He also noted that he considered the cumulative evidence, as well as any new facts raised by both parties. The final arbitration award was substantially similar to the first award, with some revisions in response to plaintiff's concerns. As far as plaintiff's complaints about the procedure, the arbitrator commented:

> The following summary, and the findings contained therein, are based on the credible testimony of the parties; the credible information contained in any exhibit; the arguments of the lawyers, and the lengthy summaries filed by both counsel.

> I have allowed both sides the opportunity to present anything further they felt was necessary to a full and complete understanding of their respective positions. Each side has submitted lengthy, additional summaries, all of which have been reviewed in detail, and against all the other evidence submitted. Plaintiff has insisted on additional "hearings". Plaintiff claims that the Award proffered to counsel for comment, was unfair, and that an ability to "confront" the Defendant and cross examine him would effect [sic] drastically his credibility.

The Arbitrator asked the plaintiff to submit a list of items that required such hearings. No list was received, but another summary was provided. The plaintiff's last summary (which was more an appeal of the proposed award) was answered by the Defendant. All of those submissions have also been carefully considered.

The defendant argues that all of the after hearing submissions of the Plaintiff are simply a rehash of old issues, and that no new issues are raised. I find that no new issues are raised. I further find that all of the topics addressed by the Plaintiff, post-hearing, were discussed on the day of the hearing I have considered the cumulative evidence, as well as any "new" facts raised by both sides.

Plaintiff's counsel takes issue with the format of the hearing, now suggesting that it should have had a more formal structure, and that the plaintiff's right of confrontation would have added another dimension to this Arbitrator's appraisal of the case. *The parties agreed to the informal nature of the hearing, and it was not until after the proposed award that any suggestion was made to testimony in a confrontational mode.* [Emphasis added.] Further, had the hearing been more formal, almost none of the written evidence would have come into the record, because most of the exhibits were hearsay. [Emphasis deleted.] Much of the commentary by the lawyers was only supported by hearsay documents.

The majority further departs from existing precedent in that it finds error in the arbitrator's findings of fact. "Claims that the arbitrator made a factual error are beyond the scope of appellate review." *Konal v Forlini,* 235 Mich App 69, 75; 596 NW2d 630 (1999). In the emphasized portion of the arbitrator's award, the arbitrator found that the parties agreed to the informal nature of the hearing. In concluding that plaintiff did not agree to this procedure and was confused by it, the majority has improperly assigned error to the arbitrator's finding.

Even if this Court could properly review the arbitrator's findings of fact, the majority ignores several important factors. First, the arbitrator considered all of plaintiff's proffered evidence. Plaintiff cannot cite a single piece of evidence that was not considered. With regard to cross-examination, the arbitrator did not "unfairly" deny plaintiff's request to cross-examine defendant, though he did deny her request. The denial was not unfair because, before plaintiff's request, the parties had agreed to meet the arbitrator separately and voluntarily did so. Moreover, plaintiff wanted to cross-examine defendant about his infidelities, which, according to the arbitration award, defendant generally admitted. Finally, plaintiff did not complain that the arbitrator failed to comply with procedural requirements of the DRAA until *after* the arbitration award was issued. It is paternalistic to conclude that plaintiff, a competent adult who entered into an agreement in the presence of her attorney and voluntarily participated in the arbitration hearing while represented by her attorney, "found it difficult to define . . . what transpired." *Ante* at 501 n 4. The only thing plaintiff found difficult was accepting the arbitration award, despite having agreed to binding arbitration and the arbitration procedure.

### V. CONCLUSION

I would affirm the arbitration award because there is no proper basis for vacating it: although the arbitration procedure was "informal" and "unorthodox," *DAIIE, supra* at 429, there is no indication that the procedures exceeded the arbitrator's authority or lacked impartiality. The parties were "afforded basic, protective rights, the most important of which is a full and fair hearing." *Ante* at 500.